UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

TYRONZA MILLER,

                Petitioner,                Case No. 1:15-cv-517

v.                                  Honorable Gordon J. Quist

STEVEN RIVARD,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

       This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254.  Petitioner is serving a term of fifteen to forty years, imposed by the St. Joseph

County Circuit Court on August 31, 2012, after a jury convicted Petitioner of

carjacking, MICH. COMP. LAWS § 750.529a, as a third-offense felony offender, MICH.

COMP. LAWS § 769.11.  In his *pro se* petition, Petitioner raises two grounds for relief,

as follows:

      I.      THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT
              TO PROVE THE OFFENSE OF CARJACKING.

      II.     THE ADMISSION OF UNDULY PREJUDICIAL PRIOR
              ALLEGED BAD ACTS EVIDENCE DENIED [PETITIONER] A
              FAIR TRIAL.

(Pet., ECF No. 1, PageID.6-7).  Respondent has filed an answer to the petition (ECF

No. 11) stating that the grounds should be denied because they are noncognizable state

law claims or have no merit.  Upon review and applying the AEDPA standards, I find

that the grounds are noncognizable and/or without merit. Accordingly, I recommend that the petition be denied.

## Procedural History

### A.    Trial Court Proceedings

The state prosecution arose from a carjacking that occurred during the early morning hours of January 19, 2012, at the Wal-Mart in Sturgis, Michigan. Petitioner was charged with carjacking, third-degree retail fraud, and being a third-offense habitual offender. Following a preliminary examination held on March 29, 2012, Petitioner was bound over on all charges. (Prelim. Exam. Tr., ECF No. 12-2, PageID.282-283.) Petitioner was tried before a jury beginning on July 17, 2012, and concluding on July 18, 2012.[1]

Sturgis Police Sergeant Ryan Banaszak testified that he was dispatched to the Wal-Mart parking lot in the early morning hours of January 19, 2012. He spoke, through an interpreter, to an hispanic woman. The woman told him that after she left the store and put her groceries into the car, a black male pulled her from her vehicle, a Chevrolet Trailblazer, and then stole the vehicle. Sometime later, the Sturgis Police Department was contacted by a third-grade school teacher, whose student, Tayvion King, had told her that he had seen the man depicted in the July 20, 2012, issue of the

---

[1]The Court will refer to the transcripts of the trial proceedings as follows:

Trial Transcript for July 17, 2012:        Tr. I, ECF No. 12-5, PageID.___.
Trial Transcript for July 18, 2012:        Tr. II, ECF No. 12-7, PageID.___.

The Court notes that a separate transcript was recorded, covering voir dire on July 17, 2012. (*See* ECF No. 12-6.) That transcript is irrelevant to the claims at issue in this case.

<u>Sturgis Journal</u>.  The picture was taken from a Wal-Mart surveillance video of the carjacking that took place in the Wal-Mart parking lot on July 19.  Tayvion told his teacher that the man in the photograph had stayed with his mother, but had left after a fight.  (Tr. I, ECF No. 12-5, PageID-319-320.)

Officer Richard Johnson responded to the call from the teacher.  He interviewed Tayvion King and his mother Brianna Boals.  At that point, Petitioner became a suspect.  (*Id.*, PageID.320.)  In addition, Johnson testified that, having viewed the Wal-Mart surveillance tape that showed the suspect entering the store wearing one pair of shoes and leaving wearing another pair, Johnson went to the shoe department at Wal-Mart and, with a store clerk went through every shoe box.  (*Id.*, PageID.321, 323-324.)  Johnson and the clerk found a box that should have contained black steel-toed boots, but actually contained a pair of Air Jordans.  (*Id.*, PageID.321, 324.)

Tayvion King testified that he was nine years old and in second grade during the preceding school year.  (*Id.*, PageID.333.)  He testified that he saw a picture in the newspaper and told his teacher, Mrs. Pagels, that the pictured man had been at his house.  (*Id.*, PageID.333-334.)  Tayvion could not identify Petitioner as the man in the picture, however.  (*Id.*, PageID.335-336.)

Brianna Boals testified that she met Petitioner through an online dating site, and she identified him in the courtroom, though she noted that he had shaved off his facial hair.  (*Id.*, PageID.338, 361.)  Boals testified that Petitioner told her he was from Stamps, Arkansas, and sent her a photo of his bus ticket from Arkansas to Kalamazoo.  (*Id.*, PageID.341, 343, 345.)  Petitioner arrived at her house in January, late in the

evening, 10:30 or 11:00 p.m. Boals stated that she had arranged for a friend of hers, Rip Rippey, to pick him up at the bus station in Kalamazoo. When Petitioner arrived, he was older than she expected and did not look like the pictures he had shared with her. She nevertheless invited him in, and they talked, watched television, and ate. (*Id.*, PageID.339.) At some point, Petitioner showed her the tattoo on his back saying "Ghetto Soldier" or "Soulja," of which he had shared pictures while they were corresponding. (*Id.*, PageID.344-345, 363-364.) Some time after Petitioner arrived, Boals decided that it was not going to work and that Petitioner needed to leave. Petitioner called a cousin from Flint to come get him, but the cousin never came. (*Id.*, PageID.339-340.)

Two and one-half days after he arrived at her home, Boals concluded that Petitioner had not taken her seriously about leaving, so she said that she was going to get someone to help her get him out of the house. She left the house and walked to the gas station to make a phone call. After she left, at around 10:15 or 10:30 p.m., Petitioner left her house and went to the gas station. (*Id.*, PageID.340-341, 346.) When Boals saw him at the gas station, she hurried home and locked the doors. (*Id.*, PageID.346.)

At the time Petitioner left her home, he was wearing black jeans, a black leather coat with a dark gray sweatshirt underneath, and a black baseball cap. (*Id.*, PageID.340-41.) Petitioner was angry that Boals made him leave, and, shortly after he left, he sent a text threatening to kill her and saying that it was war. She replied that she did not understand his hostility, because his ride was coming. (*Id.*, PageID.

341.) Petitioner continued to send Boals messages, which led her to contact the Sturgis police. The messages stopped when she wrote, "I really wouldn't come back here and try to kill me or try to follow through with any of your threats because you're all over the news up here." (*Id.*, PageID.342.) Petitioner responded, "Oh," and then apologized. (*Id.*)

The following day, Boals received a text asking, "What have you heard? What do they know about me?" (*Id.*) She did not respond. Boals also identified Petitioner as the man depicted in two photographs taken from the surveillance videos. She recognized the clothing Petitioner was wearing when he left her house in both photographs and recognized his face in one photograph. (*Id.*, PageeID.342-343.) Boals emailed Petitioner's messages to Officer Johnson. (*Id.*, PageID.346.)

Rip Rippey testified that he picked up a man, whom he identified as Petitioner, one day in January 2012 from the McDonald's that was located across the street from the bus station in Kalamazoo. (*Id.*, PageID.368, 372.) Rippey testified that Petitioner was wearing casual clothes, and Rippey thought he remembered him carrying a bag or a package. (*Id.*, PageID.368-369, 372.) Rippey acknowledged on cross-examination that he had been unable to identify Petitioner's photograph from a photographic lineup. (*Id.*, PageID.371.)

On January 18, 2012, St. Joseph County Sheriff's Department Sergeant Brian Stears and Reserve Deputy Jeremy Rice responded to a disturbance at the McDonald's in Sturgis at 10:14 p.m. Stears testified that, when he arrived, he was informed that they had a suspicious person in the lobby and wanted him investigated. (*Id.*,

PageID.375.) Stears was given a description of a man wearing a black coat with the hoodie. Stears approached and asked the man, whom he later identified as Petitioner, what he was doing. (*Id.*, PageID.376, 378.) Petitioner stated that he was waiting for a ride from Flint. Petitioner denied having any identification on him, but he stated that he had an Arkansas identification card. Petitioner gave Stears the name Latedrick Darnell Mallory with a birth date of October 22, 1984, and Stears ran it through the computer to look for warrants. The system reported that there was no record of warrants. (*Id.*, PageID.376.)

Stears then talked to the manager, who indicated that Petitioner was making people uncomfortable and she wanted Petitioner to leave. Stears returned to Petitioner, asking why Petitioner was in Sturgis. Petitioner told Stears that he had come to see a woman named "Brenda Boyer," but it had not worked out, so he was waiting for his ride to get to Flint. (*Id.*, PageID.377.) Stears told Petitioner that the manager wanted him to leave. Because the temperature was only 12 degrees outside, Stears suggested to Petitioner that he go to Wal-Mart, which was open all night and where Petitioner could probably wait. Stears and Rice then gave Petitioner a ride to the Sturgis Wal-Mart, dropping him at the northern door of the store. (*Id.*, PageID.377-378, 381.)

Stears identified the man he spoke with as the man depicted in People's Exhibits 2 and 3, and further identified Petitioner as that man in the courtroom. (*Id.*, PageID.378.) He also testified that he identified Petitioner from the second of two photographic lineups, which were presented as exhibits and which show Petitioner only

in the second lineup.  (*Id.*, PageID.380-382, 386-387.)  Stears also testified that he had learned from the jail that Petitioner had a tattoo on his back reading, "Ghetto Soulja." (*Id.*, PageID.379.)

Reserve Deputy Jeremy Rice confirmed having been with Sergeant Stears, and having talked to a man at the McDonald's before driving the man somewhere, though initially he could not recall where.  (*Id.*, PageID.392.)  After having his recollection refreshed, he testified that they drove him to the northern entrance to Wal-Mart.  (*Id.*, PageID.398.)  According to Rice, the man was dressed all in black:  black hooded sweatshirt, black hat, really baggy black jeans, and a dark color or black coat.  (*Id.*, PageID.392-393, 395.)  Rice identified People's Exhibits 2 and 3 as the man they had interviewed at the McDonald's.  He also testified that Petitioner was the same man he saw that night and who was depicted in the photographs.  (*Id.*, PageID. 393-394.)

Jacque Fales, the Asset Protection Manager at the Sturgis Wal-Mart, testified that she provided video and still surveillance photographs to the Sturgis police shortly after the carjacking incident.  She located the carjacking and then worked backward to see what time the person entered the store.  She found where the person entered and tracked his location during the hour and a half that he was in the store.  (*Id.*, PageID.412.)  After spending an hour and a half at various locations in the store, the man later followed a woman out to her SUV, and, when she started to get into her car, he pushed her to the ground, causing her groceries to fly.  (*Id.*, PageID.413.)  Fales identified the pictures she provided to the police, the earliest of which was taken at 10:31 p.m.  (*Id.*, PageID.414-418.)  She also authenticated and described a number of

videos she had compiled, showing the man's actions after arriving at the store. The videos were then played for the jury. (*Id.*, PageID.418-427.)

Michael Morey testified that he worked at the Sturgis Wal-Mart in January 2012, on the 10:00 p.m. to 7:00 a.m. shift. (*Id.*, PageID.439-440.) Morey testified that he remembered January 18, 2012, because someone's car was stolen and many police officers came to the store. Morey remembered seeing the man who stole the car. He saw the man in the vestibule, charging his phone, and saw him in the pet department several times. He also remembered the man because he was wearing his hood up most of the time, which, in Morey's experience, was usually done by people who are either trying to steal something or do not want to be seen. (*Id.*, PageID. 440-41.) The man he saw was wearing dark jean pants, white shoes, a black hoodie and a dark baseball cap. Morey then identified Petitioner as the man he saw at Wal-Mart on January 18, 2012, and who was depicted in the prosecutor's photographs, though Petitioner had a mustache and goatee in January, which he did not have at the time of trial. (*Id.*, PageID.442-443.)

Dennis Shields was the overnight manager at Wal-Mart in January 2012, and he was on duty on the night of the incident. Shields saw a man wearing a hood, who was walking around the store, which made him uneasy. He saw the man in the area of pets and snacks, and he saw him another time in the general merchandise area. Shields described the man as wearing a dark blue or black sweatshirt and dark pants. (*Id.*, PageID. 562-563.) Later that evening, Shields was called to the front of the store by his customer service manager, where a customer wanted to speak with Shields.

When he reached the front, a man translated what a female customer was reporting: that her car had been taken from her in the parking lot. Shields or one of his employees called the police. When the officer arrived, they went to the surveillance-camera area and watched the incident. (*Id.*, PageID.563-564.)

Maria Carmona testified, through an interpreter, that she lived in Sturgis and worked at Summit Polymers on second shift, between 4:00 p.m. and 12:30 a.m. In the early morning hours of January 19, 2017, after leaving work, she stopped at Wal-Mart for groceries. After checking out, she went to her car. She heard someone approach and say something, but she could not understand what was said, because it was in English. (Tr. II, ECF No. 12-7, PageID.567-568.) After she put one bag into the car, Petitioner grabbed the keys out of her hand, pushed her to the ground, and took her car. The man had dark skin, but she could not further identify the man because of her fear. (*Id.*, PageID.568-69.)

Sturgis Police Detective Sergeant Geoffrey Smith testified that he became involved in the investigation after Brianna Boals was identified as someone the suspect had texted with threatening messages. (*Id.*, PageID.571.) Smith was given a number for the phone that originated the texts: 870-953-9217. (*Id.*, PageID.572.) Smith submitted a court order for a "pen register and trap trace" on the phone, which collects the numbers of calls sent and received by the phone, in order to supply to the United States Marshals Service and the Michigan State Police information to help locate and arrest the suspect. (*Id.*, PageID.572, 575, 577.) The results of that trace located

Petitioner in Arkansas. (*Id.*, PageID.573.) A United States Marshal Fugitive Team arrested Petitioner.

Texarkana, Texas, Police Department Patolman William Sprague testified that Texarkana is a dual city, with its west side in Texas and its east side in Arkansas. (*Id.*, PageID.579.) His police department covered the Texas side. (*Id.*, PageID.588.) The city runs about two miles east and west of the state line. (*Id.*, PageID.590.) On February 27, 2012, Sprague went to 13 Stone Ridge for the possible service of a warrant and to prevent a disturbance involving animal control. He met with the owner, Cynthia Stone, in the front yard. Stone pointed to a silver SUV that was parked in the driveway and told Sprague that she thought the vehicle was stolen. She added that she had been told to wipe it down. (*Id.*, PageID.579-580.) Sprague ran the license plate of the SUV and learned it was reported stolen from Sturgis, Michigan, which he confirmed by running the VIN number of the vehicle. The vehicle was in good condition and locked. Cynthia Stone retrieved the keys from inside her house. (*Id.*, PageID.581.) Stone told Sprague that she did not know Petitioner. (*Id.*, PageID.583.) Petitioner was not located on the Texas side of the city. (*Id.*, PageID. 589.) No fingerprints were lifted from the vehicle. (*Id.*, PageID. 593.)

Sturgis Investigating Officer Ryan Banaszak obtained a map showing Texarkana in relation to Stamps, Arkansas, from the Geographical Information Services Department. (*Id.*, PageID.596.) He also obtained a map showing Texarkana, Texas and Arkansas. (*Id.*, PageID.597.) The stolen vehicle was located seven and one-

half miles from the place Petitioner was arrested and 37 miles from Petitioner's registered address in Stamps, Arkansas. (*Id.*, PageID.598-599.)

The prosecution rested, and the defense rested without presenting evidence. (*Id.*, PageID.600-601.) The prosecutor stipulated to the dismissal of the retail fraud charge. (*Id.*, PageID.604.)

At the conclusion of trial, the jury found Petitioner guilty of carjacking. (Tr. II, ECF No. 12-7, PageID. 636.) On August 13, 2012, the court sentenced Petitioner, as a third-offense habitual offender, to a prison term of fifteen to forty years. (Sentencing Transcript, (S. Tr.), (ECF No. 12-8, PageID.655)

## B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on March 19, 2013, raised the same two issues as presented in his application for habeas corpus relief. (*See* Def.-Appellant's Br. on Appeal, ECF No. 12-9, PageID.667.) By unpublished opinion issued on December 12, 2013, the Michigan Court of Appeals affirmed Petitioner's convictions and sentences. (See 12/12/13 Mich. Ct. App. Opinion (MCOA Op.), ECF No. 12-9, PageID.659-662.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court, raising the same two claims presented to, and rejected by, the Michigan Court of Appeals. Petitioner was granted leave to amend his application, in which he further developed his first issue. By order entered May 27, 2014, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the

questions presented should be reviewed.  (*See* Mich. Ord., ECF No. 12-10, PageID.721.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is

clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by

a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### I.    Sufficiency of the Evidence

In his first ground for habeas relief, Petitioner argues that the prosecutor presented insufficient evidence that Petitioner was the perpetrator of the crime. Specifically, he contends that the only witness to the carjacking, Maria Carmona, could not identify him or describe what he was wearing, and she gave an inaccurate description of his skin tone.

A Section 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera*

*v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)). This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Id.* at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

The Michigan Court of Appeals rejected Petitioner's argument as follows:

> On appeal, defendant argues first that there was insufficient evidence to support his conviction for carjacking. We review a challenge to the sufficiency of the evidence de novo. *People v Harverson*, 291 Mich App 171, 177; 804 NW2d 757 (2010). To determine the sufficiency of the evidence, we look to "whether the evidence, viewed in a light most favorable to the people, would warrant a reasonable juror in finding guilt beyond a reasonable doubt." *People v Nowack*, 462 Mich 392, 399; 614

NW2d 78 (2000). We draw all reasonable inferences in favor of the prosecution and accord deference to the trier of fact on all credibility determinations. *Id.* at 400. Defendant does not dispute that the elements of carjacking were established. He argues solely that the prosecution failed to establish his identity as the perpetrator, focusing in particular on certain witnesses' inability to identify him in court and the fact that no evidence linking him to the stolen vehicle was found. Identity is an essential element of any criminal offense. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). Identity may be proven by circumstantial evidence and the reasonable inferences arising therefrom. *Nowack*, 462 Mich at 400; see also *People v Kern*, 6 Mich App 406, 409-410; 149 NW2d 216 (1967). Moreover, positive identification by witnesses can be sufficient to establish identity. *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000).

There was sufficient evidence to convict defendant in this case. Specifically, testimony revealed that defendant arrived in Michigan from Arkansas only days before the carjacking took place. Before defendant left Boal's home, he mentioned getting a ride from someone in Flint. He was wearing dark jeans, a gray hooded sweatshirt, a black leather coat and a black baseball cap. An individual with that same description was later encountered by police at McDonald's. That individual told police he was from Arkansas, had come to meet a woman, and was waiting for a ride from someone in Flint. The individual was taken by police to Walmart, where video surveillance captured him exiting a police vehicle and entering the store. He was later seen on camera carjacking the victim. The vehicle was recovered less than eight miles from where defendant was arrested in Arkansas. Lastly, while some witnesses could not conclusively identify defendant in court, several other witnesses, including Boals, Walmart employees, and the officers who responded to the McDonald's disturbance, positively identified him as the perpetrator. Taking all the evidence in a light most favorable to the prosecution, a rational jury could conclude that defendant was the person who committed the carjacking.

(MCOA Op., ECF No. 12-9, PageID.660.) Although the Michigan Court of Appeals cited only Michigan cases, it clearly applied the *Jackson* standard.[2]

_____

[2]The Michigan Court of Appeals cited *People v. Nowack*, 614 N.W.2d 78, 81 (Mich. 2000), for the applicable standard of review. *Nowack*, in turn, expressly cites *Jackson*, 443 U.S. 307, as well as other Michigan cases that have routinely applied the

As the court of appeals noted, Petitioner does not contest whether the evidence presented at trial sufficiently supported the elements of the carjacking offense. Instead, he challenged only whether sufficient evidence was introduced to prove that he was the perpetrator of that offense, because no one identified him at the precise moment he stole the vehicle.

Contrary to Petitioner's argument, the prosecutor was not required to provide eyewitness identification from someone who saw him actually take the vehicle. Instead, the jury was entitled to rely on circumstantial evidence, which was ample. Petitioner was identified by eight different witnesses, including two police officers who drove him to the Wal-Mart, employees at Wal-Mart, and Brianna Boals, who Petitioner had come to visit from Arkansas. And the vehicle was found in Arkansas, only a few miles from where Petitioner was arrested. The court of appeals correctly recites the litany of facts that collectively permitted an extremely strong inference: that Petitioner was the perpetrator of the carjacking. Petitioner fails even to begin to climb the "nearly insurmountable hurdle" he faces in challenging the state court's sufficiency determination. *Lafler*, 658 F.3d at 531.

## II.    Evidence of Other Bad Acts

In his second ground for habeas relief, Petitioner argues that he was deprived of due process when the prosecutor was allowed to introduce evidence of other bad acts, in violation of MICH. R. EVID. 404(b) and Petitioner's right to due process. Specifically,

---

*Jackson* standard.

he contends that the prosecutor improperly introduced evidence that the McDonald's manager called the police, because Petitioner made other customers feel uneasy. In addition, he argues that the prosecutor impermissibly introduced evidence that Petitioner sent threatening texts to Brianna Boals. Petitioner further claims that trial counsel was ineffective in failing to object to the evidence of other bad acts.

There is no clearly established Supreme Court precedent holding that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence. In *Estelle v. McGuire*, the Supreme Court declined to hold that the admission of prior acts evidence violated due process. *Estelle*, 502 U.S. at 75. The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime. *Id.* at 75 n.5. While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms. The Sixth Circuit has found that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). As a consequence, Petitioner's due process claim fails.

Petitioner contends, however, that trial counsel was ineffective in failing to make an objection to the evidence, which was barred by state law. In *Strickland v.*

*Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

In addressing Petitioner's claim, the court of appeals held that, under Michigan law, the testimony that the McDonald's manager called the police because of the discomfort of patrons was admissible. The court reasoned that such evidence constituted part of the res gestae of the charged offense, and, as such, was admissible. (MCOA Op., ECF No. 12-9, PageID.661 (citing *People v. Sholl*, 556 N.W.2d 851, 857

(1996)).) It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76). Because the evidence was properly admitted, any objection by counsel would have been frivolous. An attorney's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000).

With respect to the evidence that Petitioner had sent Brianna Boals threatening text messages, however, the court of appeals held that the testimony was improperly admitted. (MCOA Op., ECF No. 12-9, PageID.661-662.) Nevertheless, the court held that reversal was not warranted because, in light of the other evidence presented at trial, Petitioner could not show that the jury would not have convicted him absent testimony about the threatening messages. (*Id.*, PageID.662.) The court therefore concluded that Petitioner could not demonstrate ineffective assistance of counsel, because he could not show that counsel's failure to object prejudiced him.

As the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of

*Strickland* is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

Petitioner cannot overcome the double deference owed to the state court's resolution of his ineffective-assistance-of-counsel claim. In fact, given the abundance of evidence in the case, the state court's determination was entirely reasonable. Petitioner was identified by eight different people who saw him over the course of a few hours, including two police officers who drove him to Wal-Mart, and Brianna Boals, who had been in his company for more than two days. He came from Arkansas to visit Brianna Boals and was expecting to be picked up by someone from Flint, according to Brianna Boals and the police officers who drove him to Wal-Mart. He also was depicted in multiple surveillance videos and still photographs taken at Wal-Mart, both before and during the carjacking incident. Wal-Mart employees identified him as the person in the surveillance photographs, and Brianna Boals recognized him from those photographs. In addition, the carjacked vehicle itself was found only a few miles from the place in Arkansas where Petitioner was arrested. In light of these facts, no

reasonable basis exists for concluding that Petitioner was prejudiced by the improperly admitted evidence. Petitioner therefore cannot demonstrate that counsel's failure to object resulted in prejudice.

## Certificate of Appealability

Should the Court deny the petition, it must determine whether a certificate of appealability should be granted. 28 U.S.C. § 2253(c)(2). A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467.

Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 529 U.S. at 484. "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of petitioner's claims. *Id.*

Examining petitioner's claims under the standard in *Slack*, reasonable jurists would not conclude this Court's assessment of petitioner's claims to be debatable or wrong. Accordingly, I recommend that the Court deny petitioner a certificate of appealability.

## Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied on its merits and that no certificate of appealability issue.

Dated: May 12, 2017          /s/ Phillip J. Green
                                      PHILLIP J. GREEN
                                      United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008). General objections do not suffice. *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).